IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| COREY FLASCO, | ) | Case No. 5:24-cv-01892 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | **MEMORANDUM OPINION** |
| ADMINISTRATION, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

I.    **Introduction**

Plaintiff, Corey Flasco ("Flasco"), seeks judicial review of the final decision of the Commissioner of Social Security denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act and supplemental security income ("SSI") under Title XVI of the Social Security Act. Flasco raises two issues on review of the Administrative Law Judge's ("ALJ's") decision, arguing:

1.    The ALJ erred in finding the opinions of the treating psychiatrist, Dr. Desai not persuasive, by cherry picking evidence of opinions of Dr. Saghafi, and

2.    The ALJ erred in the evaluation of Dr. Desai's opinions regarding supportability and consistency.

This matter is before me pursuant to 42 U.S.C. §§ 405(g), and 1383(c)(3). The parties consented to the jurisdiction of the magistrate judge pursuant to 28 U.S.C. § 636(c)(1). As substantial evidence supports the ALJ's decision and because Flasco has failed to identify any error of law in the ALJ's evaluation of his case, I affirm Commissioner's final decision.

## II.        Procedural History

On June 24, 2022, Flasco filed applications for DIB and SSI alleging his disability began September 30, 2018. (Tr. 336-42, 343-49). The claims were denied initially and on reconsideration. (Tr. 200, 201, 220, 229). On April 7, 2023, he had a hearing before an ALJ. (Tr. 241-44). Flasco, with representation, and a vocational expert ("VE") testified before the ALJ on October 19, 2023. (Tr. 165-99).

On October 31, 2023, the ALJ issued a written decision finding Flasco not disabled. (Tr. 91-115). The Appeals Council denied his request for review on August 26, 2024, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-7). Flasco timely instituted this action on October 30, 2024. (ECF Doc. 1).

## III.       Evidence

### A.        Personal, Educational and Vocational Evidence.

Flasco was 49 years old on the alleged onset date. (Tr. 109). He has at least a high school education. (*Id.*). He has past relevant work as a sales manager, DOT# 163.167-018, sedentary per DOT, light as actually performed, with an SVP of 8. (*Id.*).**Relevant Medical Evidence**

Records submitted from the Cleveland Clinic show that Flasco attended an office visit for follow up treatment of hairy cell leukemia. (Tr. 468). He presented with pancytopenia and splenomegaly and was noted to have shotty retroperitoneal lymphadenopathy. (*Id.*). Progress notes indicate that Flasco had completed one cycle of 2-CdA in March 2017, and a bone marrow biopsy three months later had shown that he had achieved complete remission. (*Id.*).

On October 18, 2020, Flasco presented to the Akron General Medical Center Emergency Department complaining of anxiety and depression he had been experiencing since being laid off from his job. (Tr. 763). He reported being unable to sleep and was requesting medications to help

2

address it. (*Id.*). He expressed a willingness to begin counseling (*id.*) but denied suicidal ideations despite telling his mother he should just kill himself. (Tr. 764).

On November 1, 2021, Flasco was found in his parked car appearing dazed and "altered." (Tr. 533). His mother reported that a similar incident had occurred about a week or two prior when his brother had found him wandering in the woods. (Tr. 539). He tested positive for opiates, and his version of events changed throughout his encounter at the emergency department. (Tr. 533-58). He was assessed with an altered mental state and rhabdomyolysis. (Tr. 550). He was noted to be encephalopathic although an MRI and EEG were both benign. (Tr. 556). In gathering further history from his wife, from whom Flasco has been separated for ten years, medical staff learned that Flasco had been irritable recently, and he had taken a lot of money out of their shared account. (*Id.*). She also reported another similar incident where their son had found Flasco after he had become lost, and, once found, he appeared confused and had soiled himself. (*Id.*). Flasco's mother also told of another recent incident where he had been hospitalized due to suicidal ideations. (Tr. 641).

Flasco was seen for a psychiatric consultation on November 1, 2021, by Rachel Bowden, APRN-CNP, who wrote that that his mentation had improved and he had less impairment in attention, concentration, and working memory. (Tr. 558). Flasco did continue to report poor sleep and anxiety but remained disinterested in receiving psychiatric care. (*Id.*). He was diagnosed with altered mental status, generalized anxiety disorder, and depression. (Tr. 562).

On August 26, 2022, Flasco attended an office visit with Bharat Shah, M.D., who assessed him with severe recurrent major depression without psychotic features and generalized anxiety disorder and formulated a treatment plan. (Tr. 858). Dr. Shah next saw Flasco on September 9, 2022, when Flasco noted that he was feeling better than before, and that his

Effexor prescription was helping him with his motivation. (Tr. 860). He still had some feelings of anxiety and depression, but he did not have agitation, aggression, or impulsivity. (*Id.*). His memory was noted to be "intact." (*Id.*). At his next session on September 19, 2022, his mother noted that Flasco seemed more motivated, and his mood had improved. (Tr. 861).

By October 3, 2022, Flasco was reporting to Dr. Shah that he was engaging in more activities, including cutting his grass, walking his dog several times daily, and applying for jobs. (Tr. 862). On October 17, 2022, Flasco reported he was talking to a friend about joining his landscaping business. (Tr. 863). Flasco mentioned at his November 14, 2022 visit that he had seen significant improvement since he first began seeing Dr. Shah, though he still had anxiety at night and when he considered going to job interviews. (Tr. 864). Examination notes from that session describe Flasco as coherent and logical, with his memory intact and no suicidal or homicidal thoughts, plans, or intentions. (*Id.*). By December 5, 2022, Flasco was reporting less anxiety and depression and felt "more courage in applying for jobs." (Tr. 865).

On January 26, 2023, Flasco went for an initial diagnostic assessment with Sonia Desai, M.D., at Comprehensive Minds, LLC. (Tr. 887-91). His chief complaint was constant anxiety and depression leading to compulsive activity, including excessive cleaning and dog walking. (Tr. 887). He also reported panic attacks and short-term memory loss. (*Id.*). His mother attended the assessment with him and reported his mental health had grown worse in the last year and he had been isolating and having paranoid delusions. (*Id.*). Dr. Desai diagnosed him with obsessive-compulsive disorder ("OCD") and major depressive disorder, recurrent, moderate. (Tr. 891).

In a progress note dated February 23, 2023, Dr. Desai noted that Flasco's medication efficacy and compliance were excellent; that his immediate recent and past memory were all "good"; and that his condition was generally improving. (Tr. 901-02). Progress notes from

4

March 23, 2023 (Tr. 903), April 6, 2023 (Tr. 905), May 4, 2023 (Tr. 954), May 11, 2023 (Tr. 965), June 1, 2023 (Tr. 977), and June 29, 2023 (Tr. 989), all document similar findings. On July 25, 2023, the progress notes are very similar, but also document increases of his dosages of Klonopin and clomipramine. (Tr. 1021).

At an eye examination on June 27, 2023, Flasco complained that despite getting a new prescription only six months earlier, even with new glasses his vision was blurry. (Tr. 1002-04). He was diagnosed with retinal detachment of the left eye, bilateral age-related nuclear cataracts, and type 2 diabetes mellitus without retinopathy. (Tr. 1004). He was scheduled to have eye surgery the following day, but pretesting showed his glucose to be in the 500's, leading to a referral to the emergency department. (Tr. 923). He was diagnosed with hyperglycemia and notes indicate that he seemed unaware that he was diabetic. (*Id.*). On June 3, 2024, he was started on insulin. (Tr. 1057). On June 24, 2023, he was assessed with poorly controlled type 2 diabetes mellitus and obesity and continued on metformin and insulin. (Tr. 1028). His A1c was measured at 11.2% (Tr. 1030).

**B.     Medical Opinion Evidence**

**i.     State Agency Reviewers**

On October 5, 2022, state agency reviewing psychologist Robert Baker, Ph.D., opined that Flasco had moderate limitations in the domains of understanding, remembering, and applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (Tr. 205). Dr. Baker further found that Flasco had moderate limitations in his ability to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace

without an unreasonable number and length of rest periods; to interact appropriately with the general public; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. (Tr. 206-08). On March 15, 2023, state agency reviewing psychologist Susan Daugherty, Ph.D., affirmed Dr. Baker's opinion. (Tr. 224, 226-27).

On December 2, 2022, state agency reviewing physician Abraham Mikalov, M.D., opined that no severe physical impairments had been documented in the record. (Tr. 204). On March 3, 2023, state agency reviewing physician Rannie Amiri, M.D., affirmed Dr. Mikalov's opinion. (Tr. 224).

### ii.        Consultative Examiners

On September 7, 2022, Sudhir Dubey, Psy.D., conducted a consultative mental health examination of Flasco. (Tr. 867-77).  Flasco indicated to Dr. Dubey that he had suffered "some sort of stroke-like episode about six or eight months ago" that had left him with short-term memory deficiencies. (Tr. 868). Flasco stated that he had been separated from his wife for eight years and he had "okay" relationships with his two children. (*Id.*). He did maintain regular contact with friends and with his mother. (*Id.*). Flasco reported feeling depressed for about six months and noted that he had lost about 20 pounds during that time. (Tr. 869). He was typically sleeping about five hours per night, with no more than three hours uninterrupted, though his energy level had not changed. (*Id.*). Flasco complained of anxiety symptoms including shortness of breath, sweating, and elevated heart rate, and suggested he was unable to work due to his cognitive and anxiety issues. (*Id.*). He had earned a bachelor's degree in international business and had previously worked at the same job for 25 yrs. (Tr. 869-70). He had started mental health treatment, including medications, two weeks prior to the consultative examination. (Tr. 869).

Testing revealed a full-scale IQ score of 89, with memory test scores in the low average to extremely low ranges. (Tr. 871). Dr. Dubey diagnosed Flasco with an unspecified neurocognitive disorder and depressive disorder and indicated that his overall prognosis was good. (Tr. 871-72).

Dr. Dubey opined that Flasco would be able to understand, remember and carry out simple and multi-step instructions independently. (Tr. 873). Dr. Dubey further indicated that Flasco would be able to maintain persistence and pace to remember and carry out simple tasks independently but would require close supervision to perform multi-step tasks independently. (*Id.*). Flasco would have "some issues" responding appropriately to supervision and to co-workers, creating some frustration for all parties (Tr. 874), and his cognitive and mood issues would cause him difficulty dealing with work pressure. (*Id.*).

On November 3, 2022, Dariush Saghafi, M.D., conducted a consultative physical examination of Flasco. (Tr. 879-86). Flasco named his chief complaints to be memory problems, noting memory loss, possible stroke, head injury, and panic attacks. (Tr. 879). He indicated that he has had memory problems for about a year, and that he will forget trash day and conversations he has had. (*Id.*). He had been taking Effexor for about six weeks. (*Id.*). He has a past diagnosis of hairy cell leukemia but had been in remission for about three years following chemotherapeutic infusions. (*Id.*). He felt his depression "really kicked in after those last treatments." (*Id.*). He reported he last worked as a director of sales but separated from that position two years prior for nonmedical reasons. (*Id.*). While he has searched for work since, he has not found anything he would "be comfortable with due to memory issues." (*Id.*).

Dr. Saghafi's opinion notes that his score of 23/30 on the Montreal Cognitive Assessment ("MoCA") is clearly abnormal for someone with Flasco's educational and work experience. (Tr. 881). Dr. Saghafi indicates he cannot rule out a potential organic component to his MoCA score

from chemotherapy as opposed to a psychiatric overlay that could be interfering with either memory function or attention. (*Id.*). Dr. Saghafi noted no other physical restrictions. (*Id.*).

### iii.      Medical Source Statement

On April 13, 2023, Flasco's physician, Dr. Desai, completed a check-box medical source statement concerning Flasco's mental capacity. (Tr. 899-900). Without any accompanying explanation, Dr. Desai checked that Flasco was moderately limited in all 32 abilities considered. (*Id.*). Dr. Desai indicated that this opinion was based on the two and a half months Flasco had been under the care of her facility. (Tr. 900).

On September 6, 2023, Dr. Desai completed the same check-box medical source statement a second time. (Tr. 1093-94). Here, after providing nine months of care, Dr. Desai indicated she had diagnosed Flasco with major depressive disorder, obsessive-compulsive disorder, and a mild cognitive impairment. (Tr. 1094). In this statement, Dr. Desai found moderate limitations in ten of the abilities considered, with marked limitation in the other 22 abilities. (Tr. 1093-94). Notably, all abilities under the heading of "Concentrate, Persist or Maintain Pace" were deemed to have marked limitations. (Tr. 1094).

In a letter written September 7, 2023, Dr. Desai reiterated the diagnoses, and noted that with medications Flasco has shown slow, minimal improvement. (Tr. 1098). His anxiety has improved, but his obsessive thoughts have persisted, and he is doing repetitive behaviors that limit him from leaving home. (*Id.*). Dr. Desai notes that Flasco has ruminating thoughts that are impacting his sleep, and that his memory has diminished following COVID-19. (*Id.*). She describes his progress as proceeding at a "snail's pace" and indicates he will continue to require follow up appointments for adjustments to his medication. (*Id.*).

### D.    Administrative Hearing Evidence

On October 19, 2023, Flasco testified before the ALJ that he lived alone with his dog who he feeds and walks several times daily. (Tr. 175-76). He indicated that his mother has to remind him about his appointments and to do errands such as taking out the trash. (Tr. 175). He is a college graduate who had a long career as director of sales at Smucker's, where he managed five regional managers and the major retailers along the east coast, and he typically travelled Mondays through Thursdays. (Tr. 175-76).

Flasco testified that he is unable to work primarily due to his memory. (Tr. 177). While his long-term memory is intact, he has trouble remembering what he is talking about during conversations, what he needs to do during a day, and whether he has taken his daily medications. (*Id.*). He will forget he has started a load of laundry or that he put something in the oven. (Tr. 178). He places notes all over his house to remind him of what he needs to do. (*Id*). Flasco stated that his medical providers have treated him with medications for his anxiety because they believe that contributes to his memory difficulties. (*Id*). He experiences panic attacks and has had to abandon carts of groceries in a store when a panic attack hits. (*Id.*). He also takes medications to help him sleep, as he will go several nights each week without sleeping at all and does not sleep more than three or four hours per night. (*Id.*). He does cognitive exercises on his iPad to try to improve his memory. (Tr. 178-79).

Flasco further testified that his mind is constantly racing, and he often walks his dog to try to calm himself down. (Tr. 179). He attends therapy sessions monthly and sometimes has crying spells and sad moods. (Tr. 181). He was diagnosed with OCD and will take several showers and run the vacuum several times daily. (*Id.*). He is very particular about things being in certain places, and he often dusts and wipes down countertops. (Tr. 181-82). As a result of his

diagnosis of PTSD he may start thinking about things that start him on a downward spiral. (Tr. 182).

Flasco has managed his diabetes through medication and lifestyle changes. (*Id.*). He notes that his weight has gone up considerably, recently to 265 pounds, which he attributes to his depression. (Tr. 183-84). He takes his dog for 30-minute walks but is ready to sit down when he returns home. (Tr. 184). He feels a general malaise and can be overwhelmed by tasks such as walking the dog. (*Id.*). He reports that he isolates himself and no longer is interested in talking to friends. (Tr. 185). He is not suicidal but has thoughts that he would not mind if he just did not wake up one day. (*Id.*).

Under questioning from his attorney Flasco testified that his mother will drive him anywhere he needs to go unless she has a doctor's appointment. (Tr. 186). His mother also helps him financially, keeps track of his appointments, and cooks most of his meals. (*Id.*). He writes himself notes to remind himself to take out the trash and to attend to calls such as the one before the ALJ. (Tr. 187).

Following Flasco's testimony, VE Deborah Dutton-Lambert testified. (Tr. 188-97). She classified Flasco's past work as a sales manager, DOT# 163-167-018, SVP generally performed at the sedentary exertional level but actually performed at light. (Tr. 190). For the ALJ's first hypothetical, he asked the VE to consider an individual of the same, education and job history as Flasco, who is capable of performing work at the medium exertional level but who would be limited to performing simple, routine and repetitive tasks; who could not perform tasks which required a high production rate pace, such as assembly line work; who could make only simple work-related decisions; who would have customary interactions with supervisors, but was limited to occasional and superficial interactions with coworkers and the general public, with

10

superficial defined as no sales, arbitration, negotiation, conflict resolution, or confrontation; who could perform no group, tandem, or collaborative tasks, and could not manage, direct, or persuade others; who could respond appropriately to only occasional changes in the routine work setting and any such changes would need to be easily explained and/or demonstrated in advance of gradual implementation. (Tr. 190-91). The VE opined that such an individual could not perform Flasco's past work but could work as a busser, DOT# 311.677-018, SVP 2, medium exertional level, with 20,000 positions in the national economy; as a floor waxer, DOT#381.687-034, SVP 2, medium exertional level, with 110,000 positions in the national economy; and as an automobile detailer, DOT# 915.687-034, SVP 2, medium exertional level, with 35,000 positions in the national economy. (Tr. 191-92).

For his second hypothetical, the ALJ asked the VE to consider all of the same circumstances of the first hypothetical except that these jobs would have to be done in a non-public work setting, (Tr. 192). This hypothetical individual could also work as floor waxer or automobile detailer, but not as a busser, so the VE replaced that position with car cleaner, DOT# 919.687-014, SVP 2, medium exertional, with 54,000 positions in the national economy. (*Id.*).

For his third hypothetical, the ALJ asked the VE to again consider all of the same circumstances of the first hypothetical, except that the exertional level would be reduced to light. (*Id.*). The VE opined that this individual could work as mail sorter, DOT# 222.687-022, SVP 2, light exertional, with 117,000 positions in the national economy; as a merchandise marker, DOT# 209.587-034, SVP 2, light exertional level, with 136,000 positions in the national economy; and as a routing clerk, DOT# 222.587-038, SVP 2, light exertional level, and 25,000 positions in the national economy. (Tr. 192-93). For his fourth hypothetical, the ALJ asked the VE to consider all of the same circumstances of the third hypothetical, except that this individual

11

would be limited to working in a non-public setting. (Tr. 193). This individual could perform the same three jobs named for the third hypothetical individual. (*Id.*).

For his fifth hypothetical, the ALJ asked the VE to consider all of the same circumstances as in the first hypothetical, but here the individual would be limited to the sedentary exertional level. (*Id.*). The VE opined that this individual could work as an addresser, DOT# 209.587-010, SVP, sedentary, with 2,000 positions in the national economy; as a document preparer, DOT# 249-587-018, SVP 2, sedentary, with 15,000 positions in the national economy; and as a circuit board assembly trainer, DOT# 726.684-110, SVP 2, sedentary, with 1,000 positions in the national economy. (Tr. 193-94). If, for a sixth hypothetical, the individual from the fifth hypothetical were limited to non-public work settings, the same jobs from the fifth hypothetical would still remain. (Tr. 194).

The ALJ then asked if an individual, at either a medium, light, or sedentary exertional level, who could only interact with supervisors, but would otherwise be isolated from coworkers or the general public, would be able to perform jobs in the national economy. (*Id*). The VE opined that those social limitations would be work preclusive. (*Id.*). Then, with regard to the first six hypotheticals, the ALJ asked what impact an additional limitation that the individual would require occasional redirection or extra supervision to stay on task would have. (*Id.*). The VE responded that while that may be appropriate during a probationary period, which could be anywhere between 30-90 days, it would otherwise be work preclusive. (Tr. 194-95). The VE opined that employers would not tolerate employees being off-task more than 14% of the work day, and, for the jobs cited, employers would not tolerate more than one absence per month. (Tr. 195). The VE confirmed that there were no skills from Flasco's past work that would be transferable to any of the proposed hypotheticals. (Tr. 196).

Flasco's attorney asked the VE if an individual had to remove themselves unexpectedly three times per month for 30 minutes at a time, if that would be viewed the same as absenteeism. (Tr. 197). The VE opined that if the removals would occur outside of regular scheduled work breaks, this limitation would be work preclusive. (*Id.*).

## IV.    The ALJ's Decision

In his decision dated October 19, 2023, the ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.

2.    The claimant has not engaged in substantial gainful activity since September 30, 2018, the alleged onset date. (20 CFR 404.1571 *et seq.* and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: Type 2 diabetes mellitus with hyperglycemia; Obesity; Depressive disorder; Obsessive compulsive disorder (OCD) and anxiety disorder; Post-Traumatic Stress Disorder (PTSD); and Unspecified neurocognitive disorder (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except: He can perform simple, routine and repetitive tasks, but cannot perform tasks which require a high production rate pace (for example, such as assembly line work), and can make only simple work-related decisions. He can have customary interaction with supervisors, but is limited to occasional and superficial interaction with coworkers and the general public (superficial meaning no sales, arbitration, negotiation, conflict resolution or confrontation, no group, tandem or collaborative tasks, and no management, direction or persuasion of others). The claimant can respond appropriately to occasional change in a routine work setting, and any changes should be easily explained and/or demonstrated in advance of gradual implementation.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

13

7.     The claimant was born on January 26, 1969, and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not    material  to  the  determination  of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969 and 416.969a).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from September 30, 2018, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 99-115).

## V.     Law and Analysis

### A.     Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine

whether a claimant is entitled to benefits:

1.     whether the claimant is engaged in substantial gainful activity;

2.     if not, whether the claimant has a severe impairment or combination of impairments;

3.     if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.     if not, whether the claimant can perform their past relevant work in light of his RFC; and

14

5. if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v)[1]; *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

**B. Standard of Review**

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*, quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d

---

[1] The regulations governing DIB claims are found in 20 C.F.R. § 404, *et seq.* and the regulations governing SSI claims are found in 20 C.F.R. § 416, *et seq.* Generally, these regulations are duplicates and establish the same analytical framework. For ease of analysis, I will cite only to the relevant regulations in 20 C.F.R. § 404, *et seq.* unless there is a relevant difference in the regulations.

at 241; *see also Biestek*, 880 F.3d at 783. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 749 (6th Cir. 2007).

## VI.    Discussion

Flasco raises two issues for this Court's review:

1. Did the ALJ err in finding the opinions of the treating psychiatrist, Dr. Desai, not persuasive, by cherry picking evidence and opinions of Dr. Saghafi?

2. Did the ALJ err in the evaluation of Dr. Desai's opinions regarding supportability and consistency?

(ECF Doc. 9, p. 1).

16

### a.  The ALJ did not err in finding Dr. Desai's opinions not persuasive as the ALJ's determination was based upon substantial evidence.

The ALJ here considered three separate opinions rendered by Dr. Desai, two of which were completed in checkbox form, on April 13, 2023 and September 6, 2023 respectively, and a third that was provided in narrative form on September 7, 2023. (Tr. 104-05). The ALJ found the opinion from April 13, 2023, which showed moderate limitations in all areas considered, to be persuasive, as it was consistent with his documented symptoms, and consistent with the record. (Tr. 104). The ALJ found the opinion from September 6, 2023, which showed more marked limitations than moderate, to be less persuasive than the April 13, 2023[2] opinion because the April 13, 2023 opinion is "more consistent with the totality of the evidence." (*Id.*). The ALJ found the narrative form opinion from September 7, 2023 to be not persuasive, as it "lacks support, within the assessment or within the treatment records," and also less persuasive than the April 13, 2023[3] opinion which "is more consistent with the totality of the evidence." (Tr. 105).

Flasco argues that the ALJ erred by cherry picking evidence in minimizing Dr. Desai's opinions and failing to analyze the entirety of Dr. Saghafi's consultative examination report. (ECF Doc. 9, p. 12). Specifically, the ALJ allegedly failed to discuss Flasco's mental status, including objective testing that measured cognitive and memory functioning. (*Id.*). Flasco claims that the ALJ cherry picked pieces of evidence from the consultative examiner's report that supported his conclusion that Flasco's cognitive deficits caused no more than moderate limitations while ignoring Dr. Saghafi's discussion of the MoCA score that is "clearly abnormal for his education and work backgrounds." (*Id.*, at p. 13). Flasco contends that the MoCA score

---

[2] In his decision, the ALJ refers to the earlier opinion as "[t]he March 2023, opinion," but context makes clear that he is referencing the opinion from April 13, 2023.
[3] See previous footnote.

demonstrates "cognitive deficits that could impact his ability to work, perform activities of daily living, and make decisions." (*Id.* at p. 13-14).

The Commissioner responds that the ALJ was not required to specifically mention the MoCA score, but that he did discuss evaluations of Flasco's short-term memory and other mental health status findings from the CE report. (ECF Doc. 11, p. 13). The ALJ also acknowledged that Dr. Saghafi's report found memory deficits. (*Id.*). The Commissioner argues that Flasco has failed to show "how a MoCA score consistent with a mild cognitive impairment supports his argument that the ALJ erred by finding only moderate limitations in mental functioning." (*Id.*).

The Commissioner further contends that the ALJ "acknowledged and extensively discussed other evidence in the record related to Plaintiff's memory and other mental status findings, including evidence from Dr. Dubey, a consultative psychological provider; Dr. Shah, a treating psychological provider; Dr. Desai, a treating psychologist; and the state agency psychological consultants. (*Id.* at p. 14). Additionally, the ALJ's RFC properly accounted for Flasco's mental limitations. (*Id.*). In arguing that the ALJ cherry picked evidence, the Commissioner claims, Flasco is merely inviting the Court to reweigh the evidence, an exercise beyond its purview. (*Id.* at p. 15).

So long as the ALJ's RFC determination considered the entire record, the ALJ is permitted to make necessary decisions about which medical findings to credit and which to reject in determining the claimant's RFC. *See Justice v. Comm'r of Soc. Sec.*, 515 F. App'x 583, 587 (6th Cir. 2013) ("The ALJ parsed the medical reports and made necessary decisions about which medical findings to credit, and which to reject. Contrary to [the claimant's] contention, the ALJ had the authority to make these determinations."). However, an ALJ improperly "cherry-picks" evidence when his decision does not recognize a conflict between the functional limitations

described in a medical opinion and the ALJ's RFC finding, and explain why he chose to credit one portion over another. *See Rogers v. Comm'r of Soc. Sec.*, No. 5:17-cv-1087, 2018 WL 1933405, at *44 (N.D. Ohio Apr. 24, 2018) citing *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013); *see also Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (stating that, if a medical source's opinion contradicts the ALJ's RFC finding, the ALJ must explain why he did not include the limitation in his RFC determination). Claims that the ALJ "cherry-picked" the record are "seldom successful" because they essentially amount to a request that the court "re-weigh record evidence", which we may not do. *DeLong v. Comm'r of Soc. Sec.*748 F.3d 723, 726 (6th Cir. 2014).

The ALJ here provided a thorough explanation of how he analyzed Dr. Desai's three opinions, including specific references concerning the cognitive and memory issues that are the subject of Flasco's first issue presented. When looking first at the opinion rendered in April 2023, the ALJ wrote that the record showed Flasco "had generally normal mental status exams including normal sleep and good memory." (Tr. 104). He further noted that Flasco is "well-educated and has performed skilled work in the past, although he developed mental health symptoms after that work ended." (*Id.*). As he turned to the September 6, 2023, that showed significantly more restrictive limitations, the ALJ noted that examinations conducted between the rendering of the two opinions again showed Flasco's "[i]mmediate, recent and past memory was normal," (*Id.*), and, in an examination performed in August 2023, that "there were no cognitive deficits. Immediate, recent and remote memory were 'good.'" (*Id.*). The ALJ wrote, in finding the two September 2023 opinions not persuasive, that "despite explicitly stating that there was improvement at every visit" the second opinion indicates "there was worsening since the April 2023 assessment." (Tr. 104-05).

19

The ALJ does note that he has "considered formal testing that showed memory issues, but also notes that memory was normal at treating source visits." (Tr. 105). He also notes a full-scale IQ in the average range. (*Id.*). He mentioned in evaluating Dr. Saghafi's consultative examination that Flasco "reported memory issues . . . [h]e was articulate and comprehended everything. There was no difficulty with calculation. Short term memory at 5 minutes for 3 objects was normal. Repetition and naming were intact." (*Id.*).

It is clear from the above that the ALJ properly considered all the relevant evidence in assessing the persuasiveness of Dr. Desai's opinions. The ALJ provided sufficient reasons for how each of the three opinions was evaluated, and how the differences among the opinions that were rendered closely in time related to Dr. Desai's examination notes. The ALJ further noted that there was objective testing that raised questions about Flasco's cognition and memory, but weighed the testing against the examination notes and arrived at the conclusion that moderate limitations, consistent with the April 2023 opinion, were appropriate. The ALJ was not required to explain every piece of evidence in the record, including the MoCA score, rather, an ALJ "can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." *Bayes v. Comm'r of Soc. Sec.*, 757 F. App'x 436, 445 (6th Cir. 2018). As required, the ALJ here recognized the conflict between his RFC and the functional limitations suggested in Dr. Desai's two September 2023 opinions, and thoroughly articulated why he chose to rely instead on the recommended restrictions from the April 2023 opinion. Having supplied ample support for his evaluation of the opinion, the ALJ's determination of the persuasiveness of the opinions was appropriate and does not provide grounds for remand.

**b. The ALJ did not err in his evaluation of Dr. Desai's opinions regarding supportability and consistency.**

Flasco argues that the ALJ did not properly consider supportability and consistency when evaluating Dr. Desai's opinions. (ECF Doc. 9, pp. 14-19). Specifically, Flasco contends the ALJ's evaluation of Dr. Desai's opinions were inconsistent with SSA regulations and relied on factors contrary to law. (*Id.* at p. 17). Flasco asserts that the ALJ focused solely on "alleged inconsistencies between Dr. Desai's notes and her opinion, and ignored the waxing and waning of symptoms, and other demonstrative support of worsening such as significant medication adjustments." (*Id.*). Flasco also avers that the ALJ ignored portions of the examination notes that reflect ongoing symptoms, minimized the overall severity of his condition and relied too heavily on certain limited daily activities to "dismiss his complaints and exaggerate his level of functioning." (*Id.*). Flasco feels the ALJ ignored the most critical portion of Dr. Desai's September 7, 2023 report, which reads "He is showing slow improvement, however these improvements are very minimal." (*Id.* at p. 18). The ALJ, in Flasco's view, failed to allow for Dr. Desai's opinion "to evolve" as reflected in her narrative statement. (*Id.*). Flasco also argues that the ALJ failed to properly assess the consistency of Dr. Desai's opinion, as he failed to address evidence such as the MoCA score noted in Dr. Saghafi's consultative examination. (*Id.* at pp. 18-19).

The Commissioner responds that there is substantial evidence supporting the analysis of Dr. Desai's opinions. (ECF Doc. 11, p. 15). In the Commissioner's view, the ALJ fully complied with the regulations and relevant case law when he considered the opinions of Dr. Desai. (*Id.*). With regard to Dr. Desai's checkbox form opinion of September 6, 2023, the ALJ found no support in the record for the marked limitations indicative of a worsening of Flasco's restrictions since the April 2023 opinion was issued. (*Id.* at p.18). The suggested worsening of Flasco's

21

mental health condition was not consistent with notes in the record indicating he was improving and having a positive response to medications without side effects. (*Id.*). The Commissioner contends the ALJ addressed consistency with the record when noting that Flasco's activities of daily living, as described throughout the record, were not consistent with the marked limitations in Dr. Desai's September 6, 2023 opinion. (*Id.* at p. 19).

As to Dr. Desai's September 7, 2023 narrative statement, the Commissioner argues that the ALJ again noted that there was no support in the statement itself or in treatment notes for the opinion. (*Id.* at p. 21). The Commissioner notes specifically that although the narrative statement indicates "slow and very minimal improvement," Dr. Desai's examination notes have no such qualifiers. (*Id.*). The ALJ also noted that treatment records indicate "good" memory, which is inconsistent with the narrative statement's claim that Flasco has "significantly diminished" memory. (*Id.*). In addressing the consistency of the narrative statement, the Commissioner again noted how the activities of daily living reported throughout the record were inconsistent with the restrictions suggested. (*Id.* at pp. 21-22). While Flasco contends the ALJ did not account for the MoCA scores, the Commissioner asserts that the ALJ acknowledged that Dr. Saghafi found memory deficits, and that Flasco failed to show how "a MoCA score consistent with a mild cognitive impairment supports his argument that the ALJ erred by finding only moderate limitation in mental functioning." (*Id.* at p. 22). Finally, the Commissioner contends that Flasco's argument here is again merely inviting this Court to re-weigh the evidence. (*Id.* at pp. 22-23).

The ALJ must "articulate how [he] considered the medical opinions" and "how persuasive [he] find(s) all of the medical opinions." 20 C.F.R. § 416.920c, see *Gamble v. Berryhill*, No. 5:16-CV-2869, 2018 WL 1080916, at *5 (N.D. Ohio Feb. 28, 2018). Factors to be considered include: (1) Supportability; (2) Consistency; (3) Relationship with the claimant,

22

including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) Specialization; and (5) other factors. 20 C.F.R. § 416.920c. Supportability and consistency are considered the two most important factors; therefore, the regulations dictate that the ALJ "will explain" how the supportability and consistency factors were considered. 20 C.F.R. § 416.920c. Supportability evaluates how well "the objective medical evidence and supporting explanations presented by a medical source" support a medical opinion. 20 C.F.R. § 416.920c(c)(1). Consistency evaluates whether the medical opinion is consistent "with the evidence from other medical sources and nonmedical sources. 20 C.F.R. § 416.920c(c)(2).

Here, the ALJ made clear how he assessed Dr. Desai's opinions, specifically giving consideration to the factors of supportability and consistency. In considering supportability, the ALJ wrote that "[t]he only support offered for the proposed moderate and marked limitation was a list of diagnoses." (Tr. 104). The ALJ added that Dr. Desai "consistently noted that the claimant improved in treatment notes, yet she endorsed worsening since the April 2023 assessment" in her September 6, 2023 opinion. (*Id.*). The ALJ wrote that treatment notes indicated normal sleep and good memory and a good response to medications with no side effects. (*Id.*). The ALJ offered the same references to Dr. Desai's treatment notes when assessing the supportability of the September 7, 2023 narrative statement, adding that the declaration in the statement suggesting Flasco had "significantly diminished" memory and poor sleep is directly opposed to repeated references in examination notes to Flasco's normal sleep and good memory. (Tr. 105).

With regard to consistency, the ALJ noted that Flasco "maintained the ability to live alone, care for himself and his dog, drive if his mother was in the car, and go on several walks per day. (Tr. 104). The ALJ further wrote:

> I have considered formal testing that showed memory issues, but also note that memory was normal at treating source visits. Further the claimant has the adequate memory to live alone, care for a pet, and perform several chores in and outside of the home. He was able to learn and retain information from diabetic education training as cited below. The claimant is well educated with a skilled work history. His full-scale IQ is in the average range. He has no legal issues and denies problems getting along with other. Other than being anxious at the store. Based on the totality of the evidence I find that he has moderate limitations overall.

(Tr. 105). This statement indicates a thorough assessment of the evidence in the entirety of the record, including objective memory and IQ testing, when weighing the varying limitations suggested in Dr. Desai's opinions.

It is clear from the above that the ALJ articulated how he considered the factors of supportability and consistency. He met his burden of building a logical bridge supported by substantial evidence that allows subsequent reviewers to follow his reasoning in determining that the findings in the April 2023 opinion, indicating moderate limitations, was persuasive, supported, and consistent with the record, while the September 2023 opinion and narrative statement, suggesting more marked limitations and significant diminishment, were unpersuasive.

Flasco contends that the ALJ relied too heavily on his "limited daily activities to dismiss his complaints and exaggerate his level of functioning," and suggested "[a] simplistic review of daily activities is usually a poor gauge of work-related functioning. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 246 (6th Cir. 2007)." (ECF Doc. 9, p. 17). It is, however, reasonable for the ALJ to have considered Flasco's ability to perform household and social activities as a factor in assessing the consistency of Dr. Desai's opinions to other evidence in the record. *See Masters v. Comm'r of Soc. Sec.*, 707 F. App'x 374, 379 (6th Cir. 2017) ("The ALJ reasonably noted that

despite her symptoms, Masters remains able to perform routine, daily tasks that he viewed as inconsistent with her allegations that her pain and symptoms were completely debilitating."); *Knapp v. Comm'r of Soc. Sec.*, No. 22-2055, 2023 WL 6800153, at *3 (6th Cir. 2023) ("The ALJ reasonably relied on [the claimant's] ability to carry out some activities of daily living, such as driving, shopping, fixing meals, doing small loads of laundry, and feeding and caring for her pet dog, in concluding that she was not as limited as she had claimed.").

Here, the ALJ considered the daily activities as part of his evaluation of Dr. Desai's opinions, but also considered other evidence in the record, including formal memory testing, full-scale IQ scores, a lack of legal issues, denials of problems getting along with others, and his education and work histories. The ALJ wrote, "Based on the totality of the evidence, I find that he has moderate limitations overall." (Tr. 105). This is reflected in his findings that the April 2023 opinion was persuasive, while the two opinions from September 2023 were not. Although not explicitly stated, the Court is able to follow the ALJ's reasoning and is satisfied that he performed the requisite analysis of this key factor. "An ALJ 'need not necessarily use the words 'supportability' or 'consistency,' as long as the ALJ still performs the requisite analysis of the factors,' and a reviewing court is able to follow the ALJ's reasoning." *Chyenne M. v. Comm'r of Soc. Sec.*, No. 2:23-CV-1475, 2024 WL 3466154, at *6 (S.D. Ohio July 18, 2024) quoting *Ford v. Comm'r of Soc. Sec. Admin.*, No. 1:22-cv-00524, 2023 WL 2088157, at *18 (N.D. Ohio Jan. 31, 2023), *report and recommendation adopted,* 2023 WL 2080159 (N.D. Ohio Feb. 17, 2023.

Further, Flasco contends that the ALJ failed to consider evidence that supports his argument for disability. (ECF Doc. 9, pp.17-18). In support of his position, Flasco offers evidence from the record that he argues supports his case. (*Id.*). This, however, is simply an invitation to reweigh the evidence in his favor. *See Nasser v. Comm'r of Soc. Sec.*, No. 22-1293,

2022 WL 17348838 at *2 (6th Cir. Dec. 1, 2022). Flasco did point to evidence in the record that suggests mental health concerns could potentially have justified granting greater weight to the opinion. This Court, however, when reviewing the ALJ's disability conclusion, is "limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir., 2007). The standard requires "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*, at 241. Under this deferential standard we do not "resolve conflicts in evidence, or decide questions of credibility." *Makela v. Comm'r of Soc. Sec.*, 22 WL 9833285 at *2 (6th Cir. Oct. 17, 2022), citing *Bass v. McMahon*, 499F.3d 506, 509 (6th Cir. 2007). So long as substantial evidence supports the Commissioner's decision this Court will not reverse "even if there is substantial evidence in the record that would have supported the opposite conclusion" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009). Here, the substantial evidence cited, and the ALJ's evaluation of the consistency and supportability of that evidence, require that the Commissioner's decision be left undisturbed.

**VII.     Conclusion**

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I affirm the Commissioner's final decision denying Flasco's applications for DIB and SSI.

Dated: May 5, 2025

Reuben J. Sheperd
United States Magistrate Judge